UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

ANTHONY ZAPPIN,                                         :

                       Plaintiff,                 :      Case No. 1:16-cv-7417

            - against -                 :

                                       :      **COMPLAINT**

ARONSON, MAYEFSKY & SLOAN, LLP,          :

                             Defendant.       Jury Trial Demanded

--------------------------------------------------------- X

       Plaintiff Anthony Zappin ("Plaintiff") hereby alleges the following against Defendant Aronson, Mayefsky & Sloan LLP ("AMS" or "Defendant"):

<u>**NATURE OF THE CASE**</u>

       1.    Plaintiff brings this action against AMS to recover damages for legal malpractice/negligence, breach of contract, excessive legal fees, intentional and negligent misrepresentation, violations of General Business Law § 349 and violations of New York Judiciary Law § 487 in connection with and related to an action *Anthony Zappin v. Claire Comfort*, Index No. 301568/14 pending in the Supreme Court of the State of New York, County of New York (the "Matrimonial Action").   AMS represented Plaintiff continuously in connection with matters relating to the Matrimonial Action, and the Matrimonial Action itself, from February 11, 2014 to July 9, 2014.

       2.    Recent media attention,[1] documentaries such as *DivorceCorp* and Sebastian Doggart's upcoming feature film *The Monstrous Maze* and groups like the Families Civil Liberties Union are beginning to shed light on an ever-growing problem within our court system.

---

[1] *See e.g.,* "PIX11 Investigates Calls to Reform 'Fraud' in New Jersey Family Court," PIX11 News, Oct. 6, 2016 *available at* https://www.youtube.com/watch?v=LPgUMxoxFD4.

Specifically, family courts have become a bastion of fraud, corruption and racketeering perpetrated by a cartel of matrimonial attorneys.  These attorneys prey on the emotional bonds between parents and children as well as the difficulties between spouses for the sole purpose of churning excessive and usurious profits in divorce actions.  Once in the family court system, these attorneys make it nearly impossible for a litigant to get out or successfully obtained a peaceful resolution.  With little oversight and the incestuous relationships between matrimonial judges and attorneys through corrupt and discriminatory organizations like the New York Women's Bar Association, matrimonial attorneys have little, if any, incentive to resolve divorces cases quickly and efficiently.[2]  Rather, more often than not, they undertake actions to fuel conflict and prevent resolution in order to keep families in court for years in an effort to drive up fees as much as possible while the divorce attorneys profit off the misery of others.

     3.     AMS is not only a prime example of the problems facing the family court system, but they are without question one of the worst offenders and leaders in perpetrating this fraud on families.  AMS attempts to bill itself as a premiere matrimonial law firm representing celebrities such as Katie Holmes, Bethenny Frankel, Rachel Uchitel and Richard Gere to name a few.  The hidden truth is that for ordinary people, like Plaintiff, AMS unnecessarily delays cases to bilk retainers, fails to take appropriate action to protect their clients' interests and unlawfully siphons

---

[2] The New York Women's Bar Association ("NYWBA") is primarily composed of matrimonial attorneys.  If there is any doubt that a collusive relationship exists between this cartel of matrimonial attorneys and the handful of matrimonial judges in New York, one only needs to look at the 2015 NYWBA Awards and Installation Dinner.  Every matrimonial judge in New York County received the "President's Special Award."  (*See* Ex. 1.)  The NYWBA almost exclusively puts on Continuing Legal Education presentations where matrimonial judges are the featured presenters.  One only needs to search YouTube for "Justice Matthew Cooper" to get a flavor of the repugnant, prejudicial and outright unethical conduct that takes place at these presentations.  AMS is one of the largest supporters and leaders of the NYWBA.

their savings and income to the point of nothing making their client's incur enormous debt, which only destroys families and children while lining AMS's pockets with exorbitant amounts of cash.

4.     Unfortunately, Plaintiff fell victim to AMS's unethical and fraudulent scam.  While representing Plaintiff, AMS deliberately and intentionally withheld material information and undertook actions – many times with Plaintiff's consent – designed to weaken Plaintiff's stance in the Matrimonial Action and encumber his claims so that AMS could prolong the litigation and bill excessive legal fees.  In doing so, AMS breached their duty of loyalty to Plaintiff and failed to exercise reasonable care and diligence to assure that Plaintiff's interests in the Matrimonial Action were fully and timely protected.  AMS's deliberately wrongful conduct and their failure to exercise reasonable care in their representation of Plaintiff placed him at a disadvantage that made it virtually impossible to recover from subsequently in the litigation and led to the *de facto* termination of Plaintiff's parental rights.  In fact, AMS botched virtually every contested issue in the Matrimonial Action to the disadvantage of Plaintiff, no doubt with an eye towards generating more litigation and more fees for AMS.  In this process AMS caused Plaintiff overwhelming financial harm, including the depletion of Plaintiff's entire savings and income.  To illustrate AMS's unbridled greed, when Plaintiff attempted to negotiate his fees back for AMS's malpractice and unethical conduct, AMS refused to return one cent.  Most importantly, though, AMS's conduct has robbed Plaintiff of a relationship with his only son in his formative years.  As a result, Plaintiff seeks damages against AMS for its unlawful and wrongful conduct.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

6.      Venue is proper pursuant to 28 U.S.C. § 1332(b) because the events that gave rise to this action occurred in this Judicial District.

## THE PARTIES

7.      Plaintiff Anthony Zappin is a resident of the State of West Virginia with an address of 1827 Washington Blvd., Huntington, WV 25701.

8.      Defendant Aronson Mayefsky & Sloan LLP is a New York limited liability partnership engaged in the practice of law with a principal place of business at 12 East 49th Street, 32nd Floor, New York, NY 10017.

## FACTUAL BACKGROUND

### The District of Columbia Litigation

9.      On November 13, 2013, Plaintiff initiated an action for child custody against his then wife, Claire Comfort ("Ms. Comfort"), in the Domestic Relations Branch of Superior Court for the District of Columbia ("DC Superior Court") through his counsel *Feldesman Tucker Leifer Fidell LLP* alleging *inter alia* the abduction of Plaintiff's newborn son, that Ms. Comfort had committed acts of domestic violence against Plaintiff and attaching text messages containing admissions from Ms. Comfort that she was "unstable" apparently suffering from post-partum depression. (*See* Ex. 2.) Plaintiff and Ms. Comfort had resided in the Washington, DC with their newborn son since October 21, 2013. On November 10, 2013, Ms. Comfort abducted Plaintiff's four-week-old child from their home in Washington, DC and flew the infant over 3,000 miles across the country to Tacoma, WA. Along with the petition for custody, Plaintiff filed an emergency petition in the DC Superior Court for the return of the child on November 13, 2013, which was granted. A *pendente lite* hearing was scheduled for November 20, 2013.

4

10.     Approximately two hours prior to the November 20, 2013 *pendente lite* hearing, Ms. Comfort filed for a tactical *ex parte* temporary order of protection in the Domestic Violence branch of the DC Superior Court.  Ms. Comfort alleged for the first time that Plaintiff had abused her on six occasions.  Her allegations were categorically false.  Ms. Comfort provided no police reports, medical records or any other credible evidence to corroborate her claims.  Her false allegations were solely made to deflect her own wrongdoing of abducting the child.  Nonetheless, Plaintiff and his counsel were blind-sided by Ms. Comfort's tactical filing.

11.     Unable to mount a defense on two hours' notice based on the then "he-said she-said" allegations and with the threat of Ms. Comfort returning to Tacoma, WA with the child, Plaintiff agreed to three months of supervised visitation with the child in order to maintain contact with the newborn.  Plaintiff and Ms. Comfort agreed on-the-record on November 20, 2013 that a *pendente lite* hearing on custody and visitation would commence approximately three months later on March 5, 2014 in the DC Superior Court.

12.     In January 2014, Ms. Comfort moved the child yet again from Tacoma, WA to New York, NY without consent or permission of Plaintiff or the DC Superior Court.  Although Ms. Comfort claimed the move was for professional reasons, Ms. Comfort's actual reason for the move was because she wished to thwart the scheduled March 5, 2014 *pendente lite* hearing in DC Superior Court.  Ms. Comfort's goal was accomplished and the DC Superior Court relinquished jurisdiction to New York State on February 7, 2014.  Plaintiff was subsequently forced to litigate the issue of custody in New York State.

<u>Plaintiff's Retention of AMS</u>

13.     After Plaintiff learned that Ms. Comfort had moved the child to New York, Plaintiff commenced an action *pro se* for custody of the child as well as for a temporary order of protection

in the New York County Family Court.  Plaintiff was granted a temporary order of protection based on Ms. Comfort's past incidents of domestic violence against him.  A hearing on custody was calendared for February 13, 2014.

14.    On February 11, 2014, Plaintiff retained AMS.  Upon their advice, AMS agreed to file for divorce against Ms. Comfort and seek custody of his infant son on Plaintiff's behalf in New York County Supreme Court.  Plaintiff paid AMS a substantial retainer of $50,000.  (*See* Ex. 3.) This was based on the understanding that AMS would file an immediate action for divorce as well as an emergency order to show cause seeking a *pendente lite* hearing on custody and access of Plaintiff's son.  AMS also agreed to represent Plaintiff in the New York County Family Court action until it could be consolidated into the divorce action.

15.    Plaintiff immediately began to have doubts concerning AMS's representation of him.  AMS filed a ***barebones two page complaint*** for divorce – without any details that lead to the dissolution of the marriage – on February 11, 2014 in New York County Supreme Court styled *Anthony Zappin v. Claire Comfort*, Index No. 301568/14.  (*See* Ex. 4.)  And, as explained more fully below, AMS breached their representations to Plaintiff and never made a motion for a *pendente lite* hearing on custody.

16.    Moreover, shortly after he was hooked by entering into the retainer agreement, Plaintiff began to start having further doubts about AMS.  The same day on February 11, 2014, AMS started to make further questionable demands and engaged in what can only be characterized as scam-like behavior.  For instance, despite Plaintiff having substantial assets at the time and was earning a salary of over $200,000 per year as an associate attorney, AMS demanded that Plaintiff's parents execute a guarantor agreement on all their assets.  When Plaintiff rebuffed the demand, AMS threatened to immediately quit, less than two days prior to the custody hearing in New York

County Family Court.  Left stranded, Plaintiff's parent's executed the guarantor agreement.  (*See* Ex. 5.)

17.     Similarly, AMS falsely represented to Plaintiff who would be representing him from the firm.  At the time of AMS's retention, AMS verbally represented that named partner Pamela Sloan – who AMS claimed was an expert in contentious custody cases – would represent Plaintiff at all court proceedings.  However, Ms. Sloan only made a brief appearance at the April 2, 2014 Initial Conference in the Matrimonial Action, leaving mid-way through the proceeding for "another matter."   Instead, junior partner Peter Stambleck – who had very little experience in contested custody cases – as well as a hoard of junior associates represented Plaintiff in virtually every court proceeding.  AMS pulled a classic "bait and switch" on Plaintiff leaving him with little confidence in AMS or its representations to Plaintiff.

18.     In the nearly six months that AMS represented Plaintiff in the Matrimonial Action, AMS failed to advance Plaintiff's interests in any form or fashion.  Rather, each action AMS undertook undermined Plaintiff's position in the litigation, made it increasingly difficult to exercise visitation with his son and buried him further in debt and attorneys' fees.  As explained below, it was apparent that rather than attempting to reach an efficient resolution of the Matrimonial Action, it was AMS's intention to keep Plaintiff and Ms. Comfort in court for as long as possible, fan the flames of the parties' conflict and siphon the parties' financial resources.  As a result of AMS's negligence and dishonest conduct explained more fully below, Plaintiff terminated AMS on July 9, 2014.

19.     AMS left the Matrimonial Action is absolutely disarray for Plaintiff to the point where no reputable matrimonial lawyer would touch the case.  Moreover, AMS had siphoned nearly all of his assets so Plaintiff could not afford to hire a new attorney.  Plaintiff was forced to

proceed with the Matrimonial Action largely *pro se*, which led to Plaintiff being mocked, tormented and disgraced by the matrimonial bar and Justice Matthew F. Cooper.[3]  In an article printed in *The New York Post* entitled "'Fool' Ex-Lawyer Still Refuses to Hire Attorney for Custody Trial," the author wrote:

> He shelled out $100,000 in seven months to the celebrity firm [AMS] that repped Katie Holmes in her split from Tom Cruise … Manhattan Judge Matthew Cooper wrote in a publicly released decision earlier this month that Zappin, 30, is the poster child for the adage 'A lawyer who represents himself has a fool for a client.'

(*See* http://nypost.com/2015/10/03/fool-ex-lawyer-still-refuses-to-hire-attorney-for-custody-trial)

### DEFENDANT'S FAILURE TO REQUEST A *PENDENTE LITE* HEARING OR MEANINGFULLY ADDRESS THE ISSUE OF SUPERVISED VISITATION

20.     The crux of contention at the early stages of the Matrimonial Action was whether Plaintiff's access with his son should be supervised and whether Ms. Comfort should maintain temporary custody of the child.  In order to affix temporary custody, a *pendente lite* hearing was necessary.  *See Carlin v. Carlin*, 52 A.D.3d 559, 560 (2nd Dept. 2008) ("[I]t is an error as a matter of law to make an order respecting custody, even in a *pendente lite* context, based on controverted allegations without having the benefits of a full hearing.")  Despite their representations to the contrary at the time of their retention, AMS never once took any action to petition the court for a *pendente lite* hearing, even despite Plaintiff and Ms. Comfort's prior agreement in the DC Superior Court that one would commence.  (*See supra* at ¶ 11.)

---

[3] To illustrate the incestuous nature of the matrimonial bar and the matrimonial bench in New York City, AMS's Peter Stambleck put on a joint Continuing Legal Education in 2013 entitled "Matrimonial Trial Institute IV: A Mock Financial Trial" with Justice Matthew Cooper.  In that presentation Justice Matthew Cooper was the mock judge, despite nearly all the attorneys who participated in the presentation having cases before him at that time.  Mr. Stambleck and Justice Matthew Cooper can be heard lauding each other throughout the presentation.

21.     Rather than simply filing a short motion petitioning for a *pendente lite* hearing on the issue of supervised access, AMS instead chose to prolong the litigation by repeatedly returning to the court every four-to-five weeks to request unsupervised visitation in proceedings that were held off-the-record and where Plaintiff was not present.   Each time when the court would apparently deny the request, AMS would pressure Plaintiff (with the threat of withdrawing as counsel) to enter into another short stipulation of supervised visitation lasting four-to-five weeks and falsely represented to Plaintiff that the court during the off-the-record proceedings "promised" that supervised visitation would be lifted after the stipulation expired.   Supervised visitation was never lifted even though Plaintiff's supervised visitation reports were stellar.   At the conclusion of each stipulation period in preparation for the next off-the-record proceeding, AMS extensively billed Plaintiff preparing faux parental "access schedules" for unsupervised visitation and "settlement proposals," which they undoubtedly knew would never be granted by the court absent a contested hearing or agreeable to Ms. Comfort.

22.     In total, AMS appeared before the court five times in six months to request unsupervised visitation.   Each time AMS failed to secure unsupervised visitation.   Plaintiff requested and even demanded that AMS file a formal *pendente lite* motion seeking unsupervised visitation with the child, to which AMS refused claiming they did not want to "upset the judge." AMS would then reassure Plaintiff that the presiding, Justice Deborah Kaplan, strongly disfavored supervised visitation and that she was a "50/50 judge" when it came to custody and access.   AMS would further attempt to pacify Plaintiff with false claims that the court had placed in the case file notes stating its intention to hold a one-day *pendente lite* hearing on the issue of supervised visitation at the expiration of each stipulation period.   However, no such notations were ever placed in the record or the file by the court.

9

23.     At one point, Plaintiff made it known that he was considering retaining new counsel, whereby Mr. Stambleck called Plaintiff one evening at his office claiming that he had just attended a Continuing Legal Education presentation by Justice Kaplan where she discussed the issue of supervised visitation and how she strongly disfavored it.  Mr. Stambleck claimed that Plaintiff had the "perfect judge" to resolve the issue of supervised visitation and that he expected it to be lifted "within weeks."  However, Mr. Stambleck's representations were categorically false and misleading.  Justice Kaplan has extensively written about the virtues of supervised visitation, even imposing it against the recommendation of the forensic custody evaluator in other matters before her.  (*See* Ex. 6.)   Such publications by Justice Kaplan known widely amongst the matrimonial bar all the more demonstrate that AMS failed to exercise reasonable care and diligence to protect Plaintiff's interests by failing to file a formal motion for a *pendente lite* hearing to purge supervised visitation and instead choosing to make informal off-the-record requests to the court.

24.     AMS's final appearance as counsel for Plaintiff occurred on or about July 7, 2014 in which they had an off-the-record conference with the court to request unsupervised visitation, which yet again failed.  Plaintiff once again demanded that AMS file a formal motion seeking a *pendente lite* hearing.  AMS had already expended Plaintiff's initial retainer as well as a large portion of another $25,000 retainer paid in May 2014.  AMS finally agreed to file a formal application for unsupervised visitation, but demanded that Plaintiff furnish AMS with an outrageous retainer of $75,000 to prepare the motion.  Shocked, Plaintiff immediately fired AMS on July 9, 2014.

25.     AMS was well-aware that the strategy of requesting unsupervised access in off-the-record proceedings would not yield Plaintiff unsupervised visitation.  Rather, what actually happened was that supervised visitation became the *de facto* parenting arrangement – with Plaintiff

having effectively waived his right to a *pendente lite* hearing.  AMS's failure to protect Plaintiff's interests cost Plaintiff any shot at having a meaningful relationship with his son.

26.     AMS's scheme was apparent, though.   Instead of addressing the parties' sole contested issue – supervised visitation – in an abbreviated *pendente lite* hearing that would have likely resolved the entire matter in its early stages, AMS wished to prolong the Matrimonial Action by repeatedly returning to court in off-the-record proceedings on a near monthly basis until the Matrimonial Action was ripe for an exponentially more expensive full contested custody trial. This placed Plaintiff at a decisive disadvantage in the Matrimonial Action as it pertained to seeking custody and access to his son as well as dramatically increased the cost of litigation and attorneys' fees to the benefit of AMS.

27.     As set forth above, in failing to request a *pendente lite* hearing on-the-record or through motion practice, AMS breached its duty of loyalty to Plaintiff and failed to exercise ordinary reasonable care and diligence in its representation of Plaintiff in the Matrimonial Action. Had AMS protected Plaintiff's interests in requesting a *pendente lite* hearing at the early stages of the litigation, it is more likely than not that Plaintiff would have prevailed in the Matrimonial Action, or, at the very least, have obtained unsupervised access with his son.

**DEFENDANT WAS NEGLIGENT IN FAILING TO PRESERVE A RECORD**

28.     As mentioned above, AMS appeared before the court on Plaintiff's behalf five times in six months to request unsupervised visitation in – April 2, 2014; May 2, 2014; May 5, 2014; June 4, 2014 and July 7, 2014.  Each one of these proceedings were held off-the-record without a court-reporter or the parties present.   AMS apparently never requested that the proceedings in the Matrimonial Action be placed on-the-record.  As a result, Plaintiff's requests

for unsupervised visitation and objections to the imposition of supervised visitation were never preserved formally in the record during the proceedings.

29.     Furthermore, AMS never filed a single document in the case reflecting Plaintiff's objection to the imposition of supervised visitation.  Rather, AMS pressured Plaintiff to sign short four-to-five week stipulations providing for supervised access with the child.  To anyone not familiar with the case and reviewing the file in the Matrimonial Action, it was as if Plaintiff had not only never contested the imposition of supervised visitation, but willingly agreed to it over and over again.  Indeed, there was absolutely no record evidencing that Plaintiff contested the imposition of supervised visitation when he eventually filed a motion for unsupervised access *pro se* after firing AMS.  Also, AMS foreclosed Plaintiff's ability to seek appellate review of the court's imposition of supervised visitation by failing to formally maintain Plaintiff's objection on-the-record.

30.     Simply put, AMS failed to adequately protect its client's interests by failing to set forth and maintain Plaintiff's opposition to supervised visitation on the record in any fashion.  Rather, it is apparent that AMS favored these off-the-record proceedings failing to preserve Plaintiff's objection to supervised visitation in an effort to prolong the litigation in order to churn more fees and drive the case into a costly full custody and access trial.  By failing to preserve Plaintiff's objection to the imposition of supervised visitation in any form on-the-record in the Matrimonial Action, AMS breached its duty of loyalty to Plaintiff and failed to exercise ordinary reasonable care and diligence in its representation of Plaintiff in the Matrimonial Action.  Had AMS protected Plaintiff's interests by preserving Plaintiff's objection to supervised visitation on-the-record, it is more likely than not that Plaintiff would have had a more favorable outcome in the Matrimonial Action.

12

## DEFENDANT WAS NEGLIGENT AND UNETHICAL IN
## THE SELECTION OF A FORENSIC CUSTODY EVALUATOR

### Defendant Selected a Forensic Custody Evaluator Without Plaintiff's Consent

31.     The Preliminary Conference Order entered by the court on April 2, 2014 in the Matrimonial Action provided for a forensic custody evaluation.  Pursuant to that order, each party was to submit three names of proposed forensic custody evaluators to the court by April 7, 2014. The court would then select a forensic custody evaluator from the six names.

32.     On April 7, 2014, AMS proposed Drs. William H. Kaplan, Rodrigo A. Pizarro and Marvin J. Aronson as forensic custody evaluators.  Prior to selecting and proposing these names, AMS did not have any discussions or contact with Plaintiff concerning its proposed forensic custody evaluators.  Plaintiff was wholly unaware of their qualifications, rates and experience. AMS unethically proposed and submitted these names without Plaintiff's knowledge or consent.

33.     Similarly, on April 7, 2014, Ms. Comfort's counsel, Robert Wallack, proposed Drs. Stephen Herman, Alan Ravitz and Bernice Schaul as proposed forensic custody evaluators.  Upon receiving Mr. Wallack's proposed list, AMS immediately agreed and consented to Dr. Alan Ravitz as the forensic custody evaluator.  (*See* Ex. 7.)  Again, AMS did not have any discussions or contact with Plaintiff concerning their consenting to Mr. Wallack's proposed choice of Dr. Ravitz as the forensic custody evaluator.  Likewise, AMS did not have any contact or discussions with Plaintiff concerning Dr. Ravitz's qualifications, rates or experience as a forensic child custody evaluator. AMS unethically consented to Dr. Alan Ravitz as the forensic custody evaluator in the Matrimonial Action without Plaintiff's knowledge or consent.

34.     Had Plaintiff known that Dr. Ravitz was proposed by Ms. Comfort and been given a chance to review Dr. Ravitz's qualifications and experience, Plaintiff would not have consented to Dr. Ravitz's selection as the forensic custody evaluator.  At that time, Dr. Ravitz was not on the

list of approved Mental Health Professionals published by the Appellate Division First and Second Departments.  Moreover, Dr. Ravitz has a well-known reputation of "churning" forensic custody evaluations with cursory analyses and recommendations.  In fact, he advertises on his website that he has "conducted well over 1,000 custody evaluations." (*See* Ex. 8.)  Most notably, though, at the time AMS consented to him, Dr. Ravitz had been terminated from the Child Mind Institute in New York, upon information and belief for malpractice, and was forced to open his own private practice.  Given these facts, no reasonable person would have chosen or consented to Dr. Ravitz as a forensic child custody evaluator.

35.     Plaintiff later learned why AMS consented so quickly to Dr. Ravitz as the forensic custody evaluator in the Matrimonial Action despite his questionable qualifications.  At that time, Dr. Ravitz was the forensic custody evaluator in the Bethenny Frankel (of Real Housewives fame) divorce action.  Ms. Frankel was represented by AMS.  Upon information and belief, Dr. Ravitz was consented to by AMS to curry favor with Dr. Ravitz in the Frankel case in an effort to procure a favorable custody evaluation report in Ms. Frenkel's matter, in essence providing Dr. Ravitz with a $60,000 to $70,000 windfall or "kickback" by agreeing to select him as the court-appointed forensic custody evaluator in *Zappin v. Comfort*.  At the time AMS consented to Dr. Ravitz as the forensic custody evaluator, they unethically failed to disclose to Plaintiff material information that they had a prior relationship with Dr. Ravitz on other matters and that he was the forensic custody evaluator in an ongoing proceeding for another client they represented.[4]

36.     By failing to obtain Plaintiff's informed consent prior to agreeing to Dr. Ravitz as the forensic custody evaluator and withholding material information concerning their pre-existing

_____

[4] During Dr. Ravitz's testimony in the Matrimonial Action, he seemed to suggest that AMS broke attorney-client privilege by telling him while working on another matter that Plaintiff fired AMS over a disagreement unrelated to fees.

14

relationships with him, AMS breached its duty of loyalty to Plaintiff and failed to exercise ordinary reasonable care and diligence in its representation of Plaintiff in the Matrimonial Action.  Given the importance that forensic custody evaluations have on the outcome of custody determinations by courts, had AMS kept Plaintiff informed and properly selected an appropriate forensic custody evaluator, it is more likely than not that Plaintiff would have received a favorable outcome in the Matrimonial Action.

<u>Defendant Knowingly Selected an Unqualified Forensic Custody Evaluator</u>

37.     The primary issue in dispute in the Matrimonial Action was the parties' competing allegations of domestic violence.  Without a *pendente lite* hearing, it was critical, if not essential, that AMS propose forensic custody evaluators who had experience in contested domestic violence cases.  AMS failed to do so and consented to Dr. Ravitz who was not an expert in the field.

38.     During the custody and access trial in the Matrimonial Action, Dr. Ravitz unequivocally acknowledged that he was not an expert in domestic violence:

> DR. RAVITZ:     That's correct.  I didn't because I mean its not my – I'm not an expert in determining whether or not abuse has occurred. I'm an expert is psychiatry and in child psychiatry and in forensic psychiatry.  I can look at patterns of allegations but I can't really discuss the veracity of allegations.  I can't do it.

> ***

> DR. RAVITZ:     It was my opinion that is was more likely than not that Claire's allegations were within the realm of accurate.

> MR. ZAPPIN:     But you just testified you are not an expert in evaluating domestic violence?

> DR. RAVITZ:     That's correct.

Indeed, in conducting his forensic custody evaluation to reach his conclusions, Dr. Ravitz failed to request the parties' medical records, interview collateral witnesses, forensically examine the

15

parties' photographic evidence or otherwise assess the voluminous evidence surrounding the allegations from both parties.  Rather, Dr. Ravitz based his conclusions as to Ms. Comfort's credibility based on an outmoded, unscientific and patently sexist conclusion:

> DR. RAVITZ:   What I make of it is they [Mr. Zappin and Ms. Comfort] had a physical confrontation with each other.  I have – I assume that when they have a physical confrontation with each other, that Anthony is stronger than Claire.

The court ultimately accepted Dr. Ravitz's farcical conclusions.

39.     Courts give great weight to the determinations of forensic custody evaluators. "While recommendation of a court-appointed evaluator is not determinative, it is a factor to be considered and is entitled to some weight."  *Doyle v. Debe*, 120 A.D.3d 676, 678 (2nd Dept. 2014). AMS was well-aware that the Matrimonial Action turned largely on the credibility of the parties' domestic violence allegations.  By failing to propose forensic custody evaluators with experience in the area of domestic violence in addition to consenting to Dr. Ravitz as the forensic custody evaluator who had no experience in the field, AMS breached its duty of loyalty to Plaintiff and failed to exercise ordinary reasonable care and diligence in its representation of Plaintiff in the Matrimonial Action.  Had a forensic custody evaluator with experience in domestic violence cases been proposed and lobbied for with the court by AMS, it is very likely the outcome of the Matrimonial Action would have been decided in Plaintiff's favor.

<u>Defendant Was Knowingly Negligent in Agreeing to a Forensic</u>
<u>Custody Evaluation Prior to Requesting a *Pendente Lite* Hearing On Custody and Access</u>

40.     As discussed above, AMS failed to exercise reasonable care and diligence in their representation of Plaintiff by failing to request a *pendente lite* hearing on custody and access at the outset of the matter.  Instead, AMS agreed to go down the dubious path of agreeing to a forensic custody evaluation – again without Plaintiff's consent – at the April 2, 2014 Initial Conference.

16

This course of action was highly unusual, particularly given the parties' contested allegations of domestic violence. In fact, in their notes AMS questioned whether it was appropriate for a forensic custody evaluator to make a recommendation of the effect of domestic violence on custody without the court first making a finding of fact the domestic violence did or did not occur:



(Ex. 9.) Despite making the note, AMS never performed or conducted any follow-up research or raised the issue with the court. Instead, AMS negligently allowed unqualified Dr. Ravitz to become the *de facto* fact-finder of the parties' allegations of domestic violence.

41. By agreeing to a forensic custody evaluation – without Plaintiff's consent – instead of pursuing a *pendente lite* hearing at the outset of the case, AMS failed to exercise ordinary reasonable care and diligence in its representation of Plaintiff in the Matrimonial Action. Had a *pendente lite* hearing been done to determine whether domestic violence occurred prior to a forensic custody evaluation, which is what occurs in the normal course of contested custody actions, it is more likely than not that Plaintiff would have prevailed in the Matrimonial Action as Dr. Ravitz's outmoded and sexist conclusions mentioned above would not have tainted or influenced the court. It would have also permitted a more thorough and accurate forensic custody

evaluation based on factual findings of the court rather than mere unsubstantiated allegations of the parties.

### DEFENDANT IMPROPERLY CONSENTED TO SUPERVISED VISITATION

42.     As stated above, Plaintiff retained AMS to file an immediate application for a *pendente lite* hearing on the issues of supervised visitation and custody of Plaintiff's child.  AMS never filed that application.  Instead, at the February 13, 2014 appearance in New York County Family Court, AMS reached an agreement with Ms. Comfort's counsel that supervised visitation would continue until the April 2, 2014 Preliminary Conference in New York County Supreme Court.  AMS reached this agreement without first consulting or advising Plaintiff.  When Plaintiff was later advised on this agreement, AMS made excuses and attempted to pacify Plaintiff claiming that this arrangement was "the best thing for the case" and that supervised visitation would be lifted at the Preliminary Conference or they would otherwise file an emergency application, none of which came to pass.

43.     Furthermore, AMS agreed – without Plaintiff's consent – that the supervised visitation would take place at Comprehensive Family Services ("CFS") in New York.  CFS was recommended by Ms. Comfort's counsel.  The cost of supervised visitation at CFS was an extremely prohibitive $150 per hour.  AMS never suggested less costly or more financially appropriate service.

44.     The cost of supervised visitation at CFS financially crushed Plaintiff, which AMS was well-aware of.  By July 2014 when Plaintiff terminated AMS, Plaintiff's invoices from CFS reached well-over $11,000 per month.  (*See* Ex. 10.)  This was unsustainable.  When Plaintiff raised the extraordinary cost of supervised visitation with AMS, they did not attempt to seek

alternative arrangements with either Ms. Comfort's counsel or the court. Rather, their expert legal advice was that Plaintiff "stop seeing the child."

45.     It should be further noted that at each of the five off-the-record appearances before the court, AMS never requested an alternative or less costly supervised visitation arrangement. Upon information and belief, AMS never raised the crippling cost of supervised visitation with the court.    Most importantly, AMS never requested that Ms. Comfort contribute to the cost of supervised visitation, despite her significant financial means and the fact that appellate courts have routinely held that both parents should share the cost supervised access where it is imposed.  *See Licira v. Licira*, 232 A.D.3d 417, 418 (2nd Dept. 1996) ("[G]iven the mother's limited resources, the Family Court erred in directing her to pay the costs of supervised visitation."); *Hover v. Shear*, 232 A.D.2d 749, 750 (3rd Dept. 1996) ("[W]e are not persuaded that [sic] Family Court erred in requiring the parties share the cost of supervised visitation");  *Karen K. v. Kenneth Z.*, 657 N.Y.S.2d 40, 41 (1st Dept. 1997) (affirming trial court's order that custodial parent pay for non-custodial parent's supervised visitation); *C.F.B. v. T.B.*, 806 N.Y.S.2d 443 at *9 (Sup. Ct. Erie Cnty. 2005) (ordering custodial grandparents to pay cost of supervised visitation with mother).

46.     By agreeing to supervised visitation without Plaintiff's consent, failing to seek more cost appropriate alternatives to CFS and failing to request that Ms. Comfort share in the cost of supervised visitation, AMS failed to exercise ordinary reasonable care and diligence in its representation of Plaintiff in the Matrimonial Action.  Had AMS appropriately protected Plaintiff's interests on these issues rather than permitting supervised visitation at CFS to become the *de facto* parenting arrangement, Plaintiff believes it would have materially changed the outcome of the proceeding and left Plaintiff with sufficient financial means to properly litigate the Matrimonial Action to its conclusion.

## DEFENDANT IMPROPERLY ADVISED PLAINTIFF AS TO CHILD SUPPORT

47.     AMS negligently advised Plaintiff as to his responsibilities with respect to child support and failed to take appropriate action to secure a *pendente lite* court order defining the parties' obligations.  Prior to the April 2, 2014 Preliminary Conference, AMS negligently and falsely represented to Plaintiff that he did not have to pay child support since he was bearing the full cost of supervised visitation.  Furthermore, at the Preliminary Conference, AMS represented to Plaintiff that they had reached an agreement with Ms. Comfort's counsel that Ms. Comfort would not seek *pendente lite* child support since Plaintiff was bearing the cost of supervised visitation, even though the cost of supervised visitation far exceeded the cost of basic child support. Moreover, this also did not take into account the fact that the cost of supervised visitation continued to escalate in future months to well-over $11,000 per month.  AMS negligently failed to reduce this "agreement" with Ms. Comfort's counsel to writing in any form, despite the fact it was apparent from AMS's notes of the proceeding that a discussion with Ms. Comfort's counsel took place.  (*See* Ex. 11.)

48.     AMS was further negligent in failing to petition the court for a *pendente lite* order requesting that the court issue directives defining the parties' obligations as to child support and the cost of supervised visitation at the outset of the proceeding.  Rather, AMS proceeded to litigate the case without any definitive resolution to these issues and without Plaintiff having any insight as to what he was obligated to pay in child support.  In the end, despite Plaintiff paying Ms. Comfort several thousand dollars over the course of the litigation to support the child while still bearing the full cost of supervised visitation that totaled over $100,000, Plaintiff was ordered to pay $41,383.03 in child support arrears on June 27, 2016.  Had AMS acted with due care and diligence to secure a written agreement with Ms. Comfort's counsel or a *pendente lite* order from

the court defining the parties' financial obligations at the outset of the litigation as typically done in contested matrimonial actions, Plaintiff would not have suffered such severe financial harm.

## DEFENDANT FAILED TO SEEK APPROPRIATE DISCOVERY TO PROTECT PLAINTIFF'S INTERESTS IN THE FORENSIC CUSTODY EVALUATION

49.     As mentioned above, AMS negligently and fraudulently agreed to a forensic custody evaluation rather than seeking a *pendente lite* hearing at the outset of the litigation.  To make matters worse, AMS failed to seek any routine documentation or discovery from Ms. Comfort that would have supported or aided Plaintiff's position in the evaluation.  This was despite repeated requests by Plaintiff that AMS seek such information, which in large part was being concealed by Ms. Comfort.  This information included:

- The names of the child's medical doctors such as his pediatricians and pediatric specialists, which were withheld from Plaintiff;

- The child's medical records as it was later discovered that the child was born with a congenital illness that Ms. Comfort had knowledge of and failed to treat for over six months;

- The names of the child's caregivers, which were withheld from Plaintiff;

- Ms. Comfort's psychiatric records as it was well-known that Ms. Comfort suffered from severe mental illness and substance addiction;

- Any digital copies of evidence that Ms. Comfort proffered to the forensic custody evaluator in support of her claims of domestic violence (which subsequently turned out to be altered); and

- Any known documentation that refuted Ms. Comfort's claims of domestic violence, which later turned out to be voluminous.

21

This was all information and documentation necessary for Plaintiff to effectively present his position and concerns to the forensic custody evaluator and for the forensic custody evaluator to do a thorough evaluation.  Yet, AMS did not make so much as a single request for any of this documentation.  Much of this documentation was later retrieved by Plaintiff *pro se* after the forensic custody evaluation had concluded.  Had it been available during the forensic custody evaluation, it is more likely than not that the recommendations of the forensic custody evaluator would have materially changed in Plaintiff's favor.

50.     AMS similarly failed to take any steps to prepare Plaintiff for the forensic custody evaluation.  They did not retain experts or otherwise take appropriate measures to verify the veracity of Plaintiff's documentation and claims, particularly with respect to Plaintiff's photographic and documentary evidence that Ms. Comfort had committed numerous acts of domestic violence against him.  Rather, Plaintiff was left largely to his own devices to navigate the minefield of the forensic custody evaluation, including preparing his own documents, exhibits and materials.

51.     Instead of seeking out relevant and necessary information and documentation to aid Plaintiff in the forensic custody evaluation, AMS instead sent out voluminous financial discovery requests.  (*See* Ex. 12.)  The vast majority of these requests were wholly irrelevant to the parties' financial circumstances.  And, at that point in the litigation, the financial portion of the Matrimonial Action was effectively being held in abeyance until custody of the child was resolved.  AMS's premature financial discovery requests were a clear attempt to pry into the parties' financials to determine how much money they could siphon from the parties over the course of the litigation.

52.     By failing to request relevant and necessary information and documentation that would have bolstered Plaintiff's position during the forensic custody evaluation, AMS failed to exercise ordinary reasonable care and diligence in its representation of Plaintiff in the Matrimonial Action.  Had AMS appropriately protected Plaintiff's interests by seeking the relevant information and documentation outlined above, Plaintiff believes it would have materially changed the recommendations of the forensic custody evaluator and thereby the outcome of the Matrimonial Action in Plaintiff's favor.

**DEFENDANT FAILED TO PETITION FOR
RENEWAL OF HIS TEMPORARY ORDER OF PROTECTION**

53.     On January 6, 2014, the New York County Family Court issued a temporary order of protection on behalf of Plaintiff against Ms. Comfort based on her repeated acts of domestic violence against him.  This temporary order of protection was automatically extended until June 4, 2014 by the Family Court until the matter was consolidated into the Matrimonial Action.  At the June 4, 2014 Compliance Conference, AMS negligently failed to request or petition the court to renew Plaintiff's temporary order of protection allowing it to lapse.  When Plaintiff questioned AMS as to why they did not seek renewal of the temporary order of protection, they did not provide an answer.

54.     AMS's negligent failure to attempt to renew Plaintiff's temporary order of protection fundamentally altered the dynamic of the litigation.  Plaintiff's temporary order of protection corroborated his claims that Ms. Comfort was the perpetrator of domestic violence, not Plaintiff.  By permitting it to lapse, it then allowed Ms. Comfort to seek an order of protection and change the narrative of the case.

55.     Moreover, AMS's failure to seek renewal of Plaintiff's temporary order of protection placed Plaintiff's safety at risk.  Subsequently, supervisors testified that they observed

Ms. Comfort following Plaintiff and the child on visitations as well as waiting for Plaintiff outside of subway stations.  Ms. Comfort even assaulted Plaintiff and the child during a visitation on April 29, 2015.  Without the temporary order of protection, Plaintiff had little recourse to redress Ms. Comfort's bizarre and frightening behavior.  Needless to say, by failing to seek renewal of Plaintiff's temporary order of protection against Ms. Comfort, AMS failed to exercise ordinary reasonable care and diligence in its representation of Plaintiff in the Matrimonial Action.

**COUNT I**
**(Legal Malpractice/Negligence)**

56.     Plaintiff re-alleges and incorporates by reference paragraphs 1 - 55 of this Complaint as though fully set forth herein.

57.     As legal counsel for Plaintiff, AMS owed Plaintiff duties of professional care, loyalty, diligence and skill.

58.     By engaging in the conduct set forth above, AMS failed to exercise ordinary reasonable care and diligence used under the same or similar circumstances by attorneys and thereby breached those duties of professional care owed to Plaintiff, which included but are not limited to:

a.     Failing to petition the court for a *pendente lite* hearing on custody and access at the outset of the Matrimonial, which was requested by Plaintiff;

b.     Failing to make any attempt to enforce Plaintiff and Ms. Comfort's agreement that a *pendente lite* hearing on custody and access would commence;

c.     Engaging exclusively in off-the-record proceedings with the court;

d.     Repeatedly misrepresenting the off-the-record proceedings with the court to Plaintiff in the Matrimonial Action;

e.     Failing to preserve Plaintiff's objection to the imposition of supervised visitation on-the-record in the Matrimonial Action;

f.     Agreeing to supervised visitation with Ms. Comfort's counsel without Plaintiff's consent;

g.     Agreeing to supervised visitation with Comprehensive Family Services at $150 per hour without Plaintiff's consent;

h.     Agreeing that Plaintiff bear the full cost of supervised visitation without Plaintiff's consent;

i.     Failing to request or petition the court for alternative supervised visitation arrangements despite being aware of the financially crippling cost to Plaintiff;

j.     Failing to request or petition the court that Ms. Comfort share in the cost of supervised visitation;

k.     Failing to consult or advise Plaintiff on AMS's proposed forensic custody evaluators prior to making their submission to opposing counsel and the court;

l.     Failing to consult or receive consent from Plaintiff to agree to Dr. Alan Ravitz as the forensic custody evaluator;

m.     Agreeing to Dr. Alan Ravitz as the forensic custody evaluator despite him being unqualified to opine on the issues in dispute in the case;

n.     Consenting to a forensic custody evaluation (without Plaintiff's consent) prior to first petitioning for a *pendente lite* hearing on temporary custody and access of Plaintiff's child;

o.    Falsely advising Plaintiff that he was not obligated to pay child support because he was bearing the full cost of supervised visitation;

p.    Claiming that AMS had reached an agreement with Ms. Comfort's counsel that she would forego *pendente lite* child support if Plaintiff paid for supervised visitation, yet failed to reduce it to writing;

q.    Failing to seek a *pendente lite* order by the court defining Plaintiff and Ms. Comfort's responsibilities with respect to child support and the cost of supervised visitation;

r.    Failing to seek relevant and necessary documentation and information during the forensic custody evaluation concerning the child and Ms. Comfort's allegations that were pertinent to Plaintiff's case;

s.    Failing to seek renewal of Plaintiff's temporary order of protection issued against Ms. Comfort by the New York County Family Court; and

t.    Such other breaches of professional duty as may be shown by discovery conducted in this action.

59.    As a direct and proximate result of AMS's negligence and failure to exercise reasonable diligence and care in their representation of Plaintiff in the Matrimonial Action, Plaintiff has suffered injury and damages in an amount to be determined at trial.

## COUNT II
### (Breach of Contract)

60.    Plaintiff re-alleges and incorporates by reference paragraphs 1 - 59 of this Complaint as though fully set forth herein.

61.    Through the conduct alleged in this Complaint, AMS materially breached its express and implied contractual obligations to Plaintiff that it would take all action legally

necessary and appropriate to protect Plaintiff's interests in the Matrimonial Action; that it would

perform all legal services with due care and diligence; and that it would provide Plaintiff with

professional, skilled and careful lawyers to handle the Matrimonial Action.

62.    As a direct and proximate result of AMS's material breach of contract, Plaintiff has

suffered injury and damages in an amount to be determined at trial.

## COUNT III
### (Excessive and Wasteful Billing)

63.    Plaintiff re-alleges and incorporates by reference paragraphs 1 - 62 of this

Complaint as though fully set forth herein.

64.    An attorney must charge a client fair and reasonable fees, and is held to the highest

standards when dealing with clients in connection with matters involving legal fees.

65.    AMS breached its duties to Plaintiff by performing legal services that were

unnecessary, inappropriate, wasteful, unlawful and which did not protect or advance Plaintiff's

interests, or legal and factual arguments in the Matrimonial Action.

66.    AMS further breached it duties to Plaintiff by charging excessive, unnecessary and

fraudulent fees and overcharging Plaintiff with respect to serves performed in connection with, or

related to, the Matrimonial Action.

67.    As a direct and proximate result of AMS's unnecessary, excessive, unlawful fees

and overcharges, Plaintiff has suffered damages in an amount to be determined at trial.

## COUNT IV
### (Intentional and Negligent Misrepresentation)

68.    Plaintiff re-alleges and incorporates by reference paragraphs 1 - 67 of this

Complaint as though fully set forth herein.

69.     AMS's actions and representations to Plaintiff described above were made intentionally, recklessly and negligently.  In performing these actions and representations, AMS acted with oppression, fraud and malice.

70.     AMS's actions and representations to Plaintiff described above were material to Plaintiff's case in the Matrimonial Action.

71.     The representations described above were reasonably relied on by Plaintiff in retaining AMS, paying AMS and other acts performed by Plaintiff in reliance thereon.

72.     Said reliance by Plaintiff actually and proximately caused Plaintiff damages in an amount to be determined at trial.

**COUNT V**
**(Violation of General Business Law § 349)**

73.     Plaintiff re-alleges and incorporates by reference paragraphs 1 - 72 of this Complaint as though fully set forth herein.

74.     AMS is, and at all relevant times herein, were engaged in consumer-related activities by engaging in the practice of law that affected consumers.

75.     At all relevant times herein, AMS utilized tactics described above that were deceptive and misleading in material respects to Plaintiff that led to Plaintiff's injury as a result.

76.     AMS's misleading and deceptive conduct, as described above, was likely to mislead and injure any reasonable consumer acting reasonably under the circumstances.

77.     At all relevant times, AMS's ongoing violations of General Business Law § 349 were willful.

78.     As a result of AMS's violation of General Business Law § 349, Plaintiff is entitled under General Business Law § 349(h) to recover damages in an amount to be determined at trial.

## COUNT VI
### (Violation of New York Judiciary Law § 487)

79.     Plaintiff re-alleges and incorporates by reference paragraphs 1 - 78 of this Complaint as though fully set forth herein.

80.     As described above AMS undertook actions to deceive Plaintiff, which included but is not limited to, withholding information for Plaintiff, making material misrepresentations, failing to preserve Plaintiff's interests in the Matrimonial Action and engaging in a course of conduct to prolong the Matrimonial Action to unlawfully churn fees.

81.     AMS intended and did deceive Plaintiff as described in detail above.

82.     As a result of AMS's violation of New York Judiciary Law § 487, Plaintiff is entitled to damages, to be trebled, in an amount to be determined at trial.

## JURY TRIAL DEMANDED

Plaintiff demands a jury on all issues which may be properly tried by jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff pays that the Court:

(a)     Enter judgment in favor of Plaintiff against Defendant;

(b)     Enter judgment awarding Plaintiff compensatory damages on all counts herein to compensate Plaintiff for Defendant's activity complained of herein and for any injury complained of herein, inclusive of interests and costs, in an amount to be determined at trial;

(c)     Enter judgment awarding punitive, exemplary, enhanced and/or treble damages as allowed by applicable state and federal law in an amount to be determined at trial;

(d)     Enter judgment awarding Plaintiff his fees and costs reasonably incurred in this action as allowed by applicable state and federal law; and

(e)     Order such other relief that the Court deems just and appropriate.

Dated:  September 22, 2016
       Huntington, WV

 

_____

Anthony Zappin
1827 Washington Blvd.
Huntington, WV 25701
(304) 654-6195 (tel.)
anthony.zappin@gmail.com
*Plaintiff, Pro Se*